## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Special Agent Ryan P. Glynn, being sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to conduct investigations and to make arrests for violations of federal laws.

2. I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 2015. I currently am assigned to the Financial Investigations Team of the New England Field Division in Bedford, Massachusetts, where I have been assigned since April 2021.

3. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

4. I have participated in all aspects of drug investigations and money laundering, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking and money laundering organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed,

and the methods of payment for such drugs, as well as the methods of laundering drug proceeds. I have also become familiar with the manner in which narcotics trafficking organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5. Based on my training and experience, I am also aware that drug traffickers and money launderers commonly use cellular telephones to communicate about and further their drug trafficking and money laundering activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers and money launderers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

**Purpose of the Affidavit**

6. I make this affidavit in support of an application for a criminal complaint charging Jose PEREZ ("PEREZ") with one count of attempted possession with intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A)(ii) ("Charged Offense"). §

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, among other things. This affidavit is intended to show that there is probable cause to believe that PEREZ committed the Charged Offense and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Background of the Investigation

9. In or around February 2024, an undercover officer (hereinafter, "UC-1") met with another individual, hereinafter referred to as, "TARGET 1," in Somerville, Massachusetts, regarding a future cocaine transaction. During the undercover meeting, TARGET 1 indicated that he was looking for a source of supply for kilogram quantities of cocaine and could provide UC-1 with an amount of U.S. Currency as a deposit. Between February 2024 and April 2025, UC-1 and TARGET 1 remained in contact regarding the potential cocaine transaction, however, no meetings or transactions took place because TARGET 1 was not able to acquire the funds for the deposit.

<u>May 1, 2025 Introduction of PEREZ to UC-1 by TARGET 1</u>

10. In early May 2025, UC-1 participated in a recorded call with TARGET 1 during which they discussed drug trafficking.[1] Specifically, TARGET 1 told UC-1 that he was ready to start "working." Based on my training, experience, and knowledge of this investigation, I believe that when TARGET 1 said he was ready to start "working" he meant that he was ready to start receiving and distributing narcotics. UC-1 asked TARGET 1 if he had the money, referring to earlier conversations where UC-1 and TARGET 1 discussed UC-1 providing TARGET 1 with up to 10-15 kilograms of cocaine in exchange for an initial payment of $80,000 to $90,000. TARGET 1 told UC-1 that he would put his friend on the phone, who TARGET 1 described as having more experience. TARGET 1 told UC-1 that they (TARGET 1 and his friend) would work together to move the "cars," which I understood to be code for kilograms of narcotics. TARGET 1 then put

---

[1] The conversations outlined herein were conducted in Spanish and, unless otherwise noted, they were recorded. A Spanish speaking member of law enforcement has reviewed the Spanish conversations and provided summary English translations, which are included herein. These translations are not verbatim.

3

his friend on the phone. As discussed in more detail herein, TARGET 1's "friend" was subsequently identified as PEREZ during this investigation.

11.  During this call, PEREZ told UC-1 that he preferred to meet UC-1 in person to discuss the details. UC-1 explained that UC-1's associate in Mexico would want partial payment for the narcotics since they (PEREZ and TARGET 1) were new customers and asked PEREZ to send UC-1 a photograph of the deposit and an identification in order to conduct further business.[2] PEREZ asked UC-1 what amount was needed to start "working" (drug trafficking) and UC-1 explained to PEREZ that UC-1 and TARGET 1 had previously discussed a deposit amount of "80-90" (referring to $80,000 to $90,000) and a price of "13.5" (referring to $13,500) per "gallon"(referring to a kilogram), for "perico," which I know from my training and experience is a term commonly used to refer to cocaine. TARGET 1 and PEREZ affirmed. PEREZ advised that the money would not be a problem. PEREZ asked UC-1 how long they (PEREZ and TARGET 1) would have to pay off the remaining balance and UC-1 indicated that they would have one week to pay off the balance and the remaining payment would be provided directly to UC-1 who would in turn send it to the associate providing the narcotics. PEREZ asked how often the "work" (drugs) would arrive, and UC-1 advised every 2-3 weeks and that UC-1 would advise of the exact date and location once the driver arrived with the "work." PEREZ affirmed. PEREZ and UC-1 agreed to meet in person at a future date to discuss the drug transaction.

12.  On May 2, 2025, UC-1 received a WhatsApp message from PEREZ using a telephone number ending in 3484 Telephone (the "3484 Telephone") indicating that he (PEREZ) was TARGET 1's friend who would be sending UC-1 the previously discussed photographs. UC-

---

[2] This deposit was a reference to the amount of money that would need to be fronted in order for UC-1 to provide controlled substances to TARGET 1 or PEREZ.

4

1 subsequently received two photographs on May 2, 2025, from the 3484 Telephone, including an identification for TARGET 1 and a photograph of cash, which would serve as the deposit, which is included below. The 3484 Telephone then sent a text message that confirmed that the photograph contained "90."



### May 6, 2025 Meeting between TARGET 1, PEREZ, UC-1, and UC-2 to Discuss TARGET 1 and PEREZ's purchase of 15 Kilograms of Cocaine from UC-1 and UC-2

13.     On May 6, 2025, following a series of voice calls and text messages between UC-1 and TARGET 1, UC-1 and TARGET 1 agreed to meet at a Starbucks in Somerville, Massachusetts. Investigators established surveillance in the area prior to the meeting. Law enforcement observed a 2017 gold Ford Explorer with Massachusetts registration number ending in Y82, (hereinafter, the "Target Vehicle"), arrive in the area and park a short distance from the Starbucks. Shortly thereafter, UC-1 advised law enforcement that UC-1 had communicated with TARGET 1 who claimed to have arrived at the Starbucks. The UC vehicle arrived shortly thereafter. At approximately 9:57 a.m., UC-1 and another undercover officer (hereafter, "UC-2")

5

exited the UC vehicle and approached the Starbucks. A minute later, law enforcement observed two males, subsequently identified as TARGET 1 and PEREZ approach the Starbucks. All four individuals then entered the Starbucks together.

14. After ordering coffees, the four individuals sat at a table outside and began talking about a future cocaine purchase, among other things. UC-1 explained to PEREZ and TARGET 1 that UC-1 spoke to UC-1's associate in Mexico who would be providing them with the "10 cars" (meaning ten kilograms of cocaine) at "13.5" (meaning $13,500), of "perico" (meaning cocaine), if they made an initial deposit of "90" (meaning $90,000). UC-1 indicated that the associate could provide "15" (meaning 15 kilograms of cocaine), if PEREZ and TARGET 1 increased the initial payment to "100-110" (meaning $100,000 to $110,000). UC-1 confirmed again that PEREZ and TARGET 1 would have a week to pay off the balance. UC-1 further explained that the "cars" (kilograms of cocaine) would be coming every 2-3 weeks directly from Mexico and were of high quality. PEREZ advised that he (PEREZ) preferred to purchase "15" (meaning 15 kilograms, rather than the 10 kilograms) to make it worth it.

15. PEREZ went on to explain to the UCs that he was looking for a better price and that he had been working for a while, which I believe was a reference to the time PEREZ spent working as a drug trafficker. PEREZ stated that he could potentially purchase up to "100" (meaning 100 kilograms of cocaine), depending on the price. Later on in the discussion, PEREZ confirmed that he wanted "15" (meaning 15 kilograms of cocaine) and UC-1 and PEREZ confirmed that the price would be "13.5" (meaning $13,500). UC-1 asked PEREZ if they could increase the initial payment to "110" (meaning $110,000) and PEREZ affirmed.

16. After further discussion, the meeting concluded, and all four individuals agreed to stay in communication in order to conduct the purchase and delivery of 15 kilograms of cocaine

in the Massachusetts area toward the end of May 2025. This meeting was audio and video recorded.

### Additional Communications Between UC-1 and PEREZ Between May 6, 2025, and June 11, 2025

17. PEREZ and UC-1 remained in contact over the next week. On May 13, 2025, UC-1 spoke to PEREZ, who was using the 3484 Telephone, via WhatsApp and they agreed to meet in person at a McDonalds located in Revere, Massachusetts, at 11:00 a.m. on May 15, 2025.

18. On May 15, 2025, in anticipation of the meeting between UC-1 and PEREZ, law enforcement set up surveillance in the area of the McDonalds. Law enforcement observed the Target Vehicle arrive in the area of the McDonalds at approximately 10:40 a.m., and park in the parking lot. The UC vehicle subsequently arrived at the meeting location and, at approximately 10:42 a.m., law enforcement observed PEREZ exit his vehicle and get into the rear passenger side of the UC vehicle where UC-1 and UC-2 were located. During the meeting, which was audio and video recorded, UC-1 told PEREZ that "15 cars" (15 kilograms of cocaine) would be crossing soon and would let him (PEREZ) know the delivery date. PEREZ affirmed.

19. After the May 15, 2025 meeting, UC-1 and PEREZ remained in contact and met in person on a number of occasions. PEREZ and UC-1 continued to discuss the 15-kilogram cocaine purchase.

20. On June 8, 2025, UC-1 contacted PEREZ and made PEREZ aware that the previously-discussed narcotics had crossed into the United States via the U.S.-Mexican border in Texas, and the narcotics would be delivered to the Boston, Massachusetts area by Wednesday, June 11, 2025. Accordingly, UC-1 and UC-2 planned to meet with PEREZ on June 11, 2025, at a location in Framingham, Massachusetts, to exchange what PEREZ believed to be 15 kilograms of cocaine for $150,000.

### June 11, 2025 15-Kilogram Planned Cocaine Deal with PEREZ for $150,000

21. In anticipation of the controlled purchase later that day, on June 11, 2025, at around 5:06 a.m., law enforcement began surveillance of PEREZ's residence located in Brockton, Massachusetts (hereinafter, "Target Residence"). At approximately 6:32 a.m., investigators observed PEREZ exit the Target Residence with a minor child and depart the area in a Red Chevy pick-up truck. Mobile surveillance was maintained as PEREZ travelled to drop off his minor child at school, stopped at a Dunkin Donuts, and then travelled to PEREZ's business, JP Auto Body, located at 80 Ceylon Street, in Dorchester, Massachusetts, (hereinafter, "JP Auto Body"), where PEREZ arrived at approximately 8:14 a.m. During PEREZ's travel from the Target Residence to JP Auto Body, at approximately 7:15 a.m., PEREZ placed a call to UC-1 and confirmed the pick-up for 10:30 a.m. that day at the meeting location in Framingham.

22. At approximately 8:26 a.m., the Target Vehicle, driven by an unknown individual, arrived at JP Auto Body. Thereafter, investigators observed PEREZ leave JP Auto Body in the Target Vehicle. Investigators maintained surveillance as PEREZ travelled from JP Auto Body back to the Target Residence in the Target Vehicle. Investigators observed PEREZ enter the Target Residence and then exit approximately ten minutes later. PEREZ did not appear to be holding a bag when he exited the Target Residence, but did go to the back of the Target Vehicle, where investigators subsequently learned that a hidden compartment is located, and appeared to manipulate something in the backseat of the Target Vehicle. A few minutes later, PEREZ departed the Target Residence and travelled from Brockton to the area of the meeting location in Framingham, Massachusetts.

23. At approximately 10:25 a.m., PEREZ arrived at the meeting location and subsequently parked the Target Vehicle. Approximately 5 minutes later, PEREZ called UC-1 and

advised that he (PEREZ) was at the meeting location. Approximately 2 minutes later, UC-1 and UC-2 exited an apartment near the meeting location and walked to the Target Vehicle. UC-1 entered the front passenger seat of the Target Vehicle and UC-2 got into the backseat of the Target Vehicle. PEREZ, UC-1, and UC-2 discussed narcotics and PEREZ indicated that he (PEREZ) was receiving narcotics from the imminent purchase with UC-1 and UC-2, and, the following day (June 12, 2025) PEREZ would be receiving an additional forty kilograms. At approximately 10:43 a.m., PEREZ got out of the front seat of the Target Vehicle and then re-entered the backseat of the Target Vehicle and retrieved a bundle of currency wrapped in plastic with "150K" written on the bundle from the hidden compartment. At that point, PEREZ provided the currency to UC-1. UC-2 then exited the Target Vehicle and went to retrieve fifteen bricks of sham cocaine (representing 15 kilograms of cocaine) in exchange for the currency.

24.     At approximately 10:46 a.m., UC-2 arrived back at the Target Vehicle with the bag with the 15 kilograms of sham cocaine. PEREZ inspected the bag and then began to take the sham kilograms out of the bag to put into the hidden compartment in the Target Vehicle. After approximately four kilograms of sham cocaine were placed into the hidden compartment by PEREZ, law enforcement approached PEREZ and took him into custody.

## CONCLUSION

25. Based on the foregoing, there is probable cause to believe that on or about June 11, 2025, PEREZ did attempt to possess with intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and (b)(1)(A)(ii).

Respectfully Submitted,

_/s/ Ryan P Glynn/_
RYAN P. GLYNN
Special Agent
Drug Enforcement Administration

Sworn to ~~and sworn~~ in accordance with the requirements of Fed. R. Crim. P. 4.1 on June  11 , 2025.

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge

2:38 p.m.

10